
RECEIVED
IN MONROE, LA.
APR 1 8 2012
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CR. A. NO. 10-200-02 |
| VERSUS | JUDGE ROBERT G. JAMES |
| ARTHUR GILMORE, JR. | MAG. JUDGE KAREN L. HAYES |

### WRITTEN REASONS FOR RULING ON OBJECTIONS TO PRE-SENTENCE REPORT AND DEFENDANT'S MOTION FOR DOWNWARD DEPARTURE OR, IN THE ALTERNATIVE, FOR A VARIANCE FROM THE SUGGESTED GUIDELINE RANGE

Prior to sentencing in this matter, Defendant Arthur Gilmore, Jr. ("Gilmore") raised objections to the Pre-Sentence Report. In addition, he filed a Motion for Downward Departure or, in the Alternative, for a Variance from the Suggested Guideline Range ("Motion for Downward Departure") [Doc. No. 166] and a Sentencing Memorandum in Support of Request for Downward Departure; or, Alternatively, Motion for a Non-Guideline Sentence ("Sentencing Memorandum") [Doc. No. 165]. Finally, during an in-Chambers conference, Gilmore's counsel raised one additional objection to his Guidelines calculation.

The Government also filed a Sentencing Memorandum [Doc. No. 163], a Response to Defendant's Motion for Downward Departure, or, in the Alternative, for a Variance from the Suggested Guideline Range ("Response to Motion") [Doc. No. 167], and a Response to Sentencing Memorandum [Doc. No. 168].

At the sentencing hearing held on April 16, 2012, the Court ruled on Gilmore's objections, his Motion for Downward Departure, and considered his sentence under those factors set forth in 18 U.S.C. § 3553(a). The Court granted Gilmore's Objection #1 and reduced the

total amount of loss to $1,437. The Court also granted Gilmore's Objection #3 in part, reducing his total offense level to 22, resulting in a recommended range of imprisonment of 41-51 months and recommended fine range of $7,500-$75,000. The Court otherwise denied Gilmore's objections and also denied his Motion for Downward Departure. The Court now issues these written reasons for its rulings and determination of sentence.

I.  **OBJECTIONS TO PRE-SENTENCE REPORT**

   A.  **Objection #1**

   Gilmore objected to the loss calculation contained in paragraphs 30 and 40 of the Pre-Sentence Report. Specifically, he claimed that the amount of loss should not include the figure of $163,178, which was the difference between the anticipated sales price of the Sherrouse Plantation Subdivision lot ($173,178) and the amount Gilmore offered to pay for the lot ($5,000-$10,000) once the subdivision was completed. Gilmore argued that the Government must prove that the loss was intended, not possible, but the amount in this case was entirely speculative and unsupported by the evidence. Gilmore contends that the Government could not show intended loss when there was no binding obligation between Gilmore and Eddie Hakim ("Hakim"), when there was no Sherrouse Plantation Subdivision in which to buy a lot, and when the conversations referred only to a prospect that might happen in the future.

   The Government responded that Gilmore chose the most expensive lot in the plat of the proposed Sherrouse Plantation Subdivision, which was clearly marked with its price, and stated that he would pay between $5,000 and $10,000 for the lot. The Government contends that the transaction was not completed because this was an undercover investigation, and, as Agent Bill Chesser testified at trial, the FBI would not allow Hakim to go forward with seeking the

"undedication" of the roads by the City of Monroe, so that the roads could be incorporated into the subdivision. The Government further argues that since Gilmore attempted to obtain a bribe, he should not be given a benefit because the FBI prevented the completion of the bribe.

United States Sentencing Guidelines § 2C1.1 provides the base offense level of 14 for offenses involving public officials who offer, give, solicit or receive a bribe. In addition to other enhancements, pursuant to U.S.S.G. § 2C1.1(b)(2), "[i]f the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest, exceeded $5,000," then, pursuant to the table in § 2B1.1, a defendant's offense level is increased based on the amount of loss. In this case, the Probation Officer determined that Gilmore should be enhanced 10 levels for losses of more than $120,000.00, but not more than $200,000.00.

The Guidelines instruct that "Loss" means the greater of either "actual loss" or "intended loss." U.S.S.G. § 2B1.1, cmt. n. 3(A). "'Actual loss'" is "the reasonably foreseeable pecuniary harm that resulted from the offense." "'Intended loss'" is "the pecuniary harm that was intended to result from the offense[,] and . . . includes intended pecuniary harm that would have been impossible or unlikely to occur," such as during a sting operation. U.S.S.G. § 2B1.1 cmt. n. 3(A)(i)-(ii). "'Pecuniary harm' means harm that is monetary or that is otherwise measurable in money. . . ." U.S.S.G. § 2B1.1 cmt. n. 3(A)(iii).

The Government has the burden to "prove by a preponderance of the evidence that the defendant had the subjective intent to cause the loss that is used to calculate his offense level." *United States v. Sanders*, 343 F.3d 511, 527 (5th Cir. 2003); *see also United States v. John*, 597

F.3d 263, 279 n.58 (5th Cir. 2010) (quoting same). Further, "[t]he method used to calculate the amount of loss . . . must bear some reasonable relation to the actual or intended harm of the offense." *John*, 597 F.3d at 279 (citation omitted). However, the Court need only make a reasonable estimate of loss based on available information and taking into account appropriate and practicable factors. U.S.S.G. § 2B1.1, cmt. n.3(C).

  In this case, the Government has established an actual loss of $1,437 in cash payments, which Gilmore did not contest for purposes of sentencing. However, the Government also attempted to show that Gilmore intended to cause a pecuniary loss of $163,178 by offering to pay $5,000 to $10,000 for a lot in Sherrouse Plantation Subdivision, which was worth at least $173,178. In order to support this claim, the Government relied solely on the testimony of Hakim and his brother, Joseph Hakim, that they intend to develop the raw land into an exclusive subdivision with lots that would sell for the high prices marked on the proposed plat. Specifically, at trial, Hakim testified that the larger lot Gilmore wanted would have a value of $173,178. The Government asserts that it took no action to increase the amount of loss, even giving Gilmore a 2/3 acre lot when he requested a one-acre lot.

  First, the Court agrees with the Government that it did not have to prove that Gilmore and Hakim had a contract or other binding obligation in order to show that Gilmore intended the loss that would have occurred if he purchased the lot for less than fair market value. As the Government pointed out, "[o]ffenses involving attempted bribery are frequently not completed because the offense is reported . . . or an individual involved in the offense is acting in an undercover capacity. Failure to complete the offense does not lessen the defendant's culpability . . . . Therefore, . . . attempts are treated as equivalent to the underlying offense." U.S.S.G. §

4

2C1.1 (background commentary). In its ruling on post-trial motions, the Court found there was sufficient evidence for the jury to conclude, if it did,[1] that Gilmore knew Hakim was offering to sell him a lot at a reduced price with the intent to influence his actions as a City Councilman. *See* [Doc. No. 171]. However, the jury had to determine only that the lot was worth more than $10,000. This Court, however, must have sufficient evidence to make a reasonable estimate as to the amount of the intended loss. Contrary to the Government's memorandum, the mere fact that Hakim, the developer, marked the price on a proposed plat does not make it so.[2] [Doc. No. 163, p. 4].

Between 2008, when Gilmore and Hakim discussed the lot, and the date of this hearing in

---

[1]Although the Government offered to use a special verdict form in this case, Defendants declined the use of the form. Accordingly, the Court does not know if the jury found that Gilmore committed two, three, or all of the racketeering acts charged against him. The jury was instructed, in part, that Gilmore was alleged to have committed four racketeering acts, and that the Government had to prove "[a]t a minimum, a pattern of racketeering activity," which "requires at least two acts of racketeering activity within ten years of each other as to each Defendant . . . ." [Doc. No, pp. 17-18]. The jury was further instructed that its members had to be "unanimous as to which racketeering acts you each believe beyond a reasonable doubt that each Defendant committed." *Id.* at p. 18. Thus, the jury could have convicted Gilmore if it found he committed any two acts of racketeering.

Nevertheless, the Court found that the Government has shown by a preponderance of the evidence that Gilmore committed this racketeering act, and the Court properly considered any loss resulting from this act as relevant conduct. U.S.S.G. § 1B1.3( ("Unless otherwise specified, . . . specific offense characteristics . . . shall be determined on the basis of . . . (1)(A) all acts and omissions committed . . . by the defendant . . . that occurred during the commission of the offense of conviction . . . .").

[2]The Government's argument has some appeal. If a defendant is presented with a plat that shows a certain price for a lot, then if he offers less than the price marked, it seems reasonable that he "intended" to cause a loss of the difference between the price marked and his offer. However, if this interpretation of intended loss is correct, the Government could mark any price on a fake plat (e.g., $1 million), regardless of economic realities, and contend that the defendant intended to cause that loss, even if the defendant subjectively knew that the price marked was not fair market value.

2012, Hakim has not developed the subdivision, and no lots have been sold. While the Government contends that the only reason the subdivision has not been developed is the action of the FBI, Hakim previously testified to the Court that he had continued to acquire land for the development of the subdivision. Further, as the Government noted during the sentencing hearing, there has been an economic downturn which certainly affects real estate development. At this time, the undeveloped land is located in a commercial area with a trailer park on at least a portion of the property. Even if Gilmore intended to get a "deal" in return for assisting Hakim before the City Council, he would not have believed that a lot was worth anywhere near the amount Hakim had marked on the plat. Gilmore was well aware of the current condition of the area, since, as Hakim admitted, Gilmore's current home is located less than two blocks from the land in question.

The Court also considered the Government's argument that Hakim used a price of $6.00 per square foot to calculate the prices for the lots on the proposed plat, which is the approximately the same price he used in one of one of his completed developments, Maison Orleans. However, Hakim admitted in his trial testimony that a number of the lots in Maison Orleans have not sold. Further evidence was presented to the Court in the January 12, 2012 hearing on the Government's Motion to Reconsider that Joseph Hakim has built on one of the lots in Maison Orleans and another one of the lots which had been "sold" was actually given to Hakim's employee, David Moses.[3] Additionally, the Court is aware that Maison Orleans is located in a developed area of Monroe, near another desirable subdivision. In contrast, the

---

[3] Moses built a home on the lot and is supposed to pay for the lot if and when he sells his home.

Sherrouse Plantation Subdivision is located in an area very close to the University of Louisiana at Monroe, which has not had recent residential or commercial development and is currently not a desirable area. Thus, the Court does not believe Hakim's use of a price of $6.00 per square foot was reasonable.

The Court also considered the value of the raw land. However, the evidence before the Court suggests that the value of the raw land was approximately what Gilmore offered to pay for the lot.

Whatever the reasons for the fact that Sherrouse Plantation Subdivision has not been developed in the past four years, the Court cannot reasonably estimate the value of the lot at $173,178 or any other number, when the subdivision itself does not exist, it is unclear when the subdivision will be developed, there is no comparable subdivision in Ouachita Parish, and the raw land is worth approximately what Gilmore offered to pay. Given the record before it, the Court could only guess at the value of the lot Gilmore wished to buy in an "upscale" subdivision based on the Court's own knowledge of lot prices in this area.[4] A guess is not a reasonable estimate of the pecuniary harm Gilmore's purchase of the lot would have caused. Thus, the Court's finds that the Government has failed to meets its burden of proving intended loss. Gilmore's Objection #1 was GRANTED. Since his remaining bribes caused an actual loss of $1,473, Gilmore's offense level was reduced by 10 levels.

**B.     Objection #2**

Gilmore objected to the two-point enhancement for obstruction of justice, which is

---

[4]The Court's own knowledge suggests that a lot, even a larger lot, in the area where the Sherrouse Plantation Subdivision is to be developed, would not sell for anywhere near the price of $173,178.

addressed in paragraphs 31, 33, and 44 of the Pre-Sentence Report. Gilmore pointed out that the Government must identify the specific statements which it contends constituted willful obstruction of justice. Gilmore argued that, despite the verdict, there was insufficient evidence to show that he willfully obstructed justice based on his statements at trial.

The Pre-Sentence Report identifies the following statements from Gilmore's testimony at trial as willful obstruction of justice:

1. Eddie Hakim testified that he had been paying money to Gilmore since 2004, initially through a third party (Johnny Maroney), but later directly. Gilmore described all of the money he received from Hakim as money to help others.

2. Hakim testified that, prior to the FBI investigation, he and Gilmore had discussed Gilmore obtaining property in the Sherrouse Plantation subdivision. On March 26, 2008, when Gilmore said he was saving Hakim "for something bigger," Hakim testified this meant Sherrouse Plantation. Gilmore testified this was a joke and did not mean anything.

3. Hakim testified he routinely gave Gilmore money whenever Gilmore went out of town. Gilmore denied this, but Hakim's assertion was confirmed in a recorded conversation on March 27, 2008, between Gilmore and Hakim. An excerpt of the recording was provided as proof for the Probation Officer.

4. Also during the March 27, 2008, lunch meeting Gilmore denied he solicited money from Hakim. An excerpt from the recording of the meeting indicates Gilmore did solicit money from Hakim.

5. Gilmore testified Hakim had described Sherrouse Plantation as comprising moderate homes and townhomes. In reality, when they were out on the property, Hakim described the subdivision to Gilmore as very upscale, a really exclusive gated community and more expensive than River Oaks subdivision.

6. On the recordings, Hakim made it clear he was willing to sell the property to Gilmore at a greatly reduced price because he needed Gilmore's help getting the project through city hall. Gilmore testified this was "just Eddie talking" and he never intended to "take advantage of him like that." Gilmore testified he only told Hakim he would pay between $5,000 to $10,000 for the property "just so we could move the, the conversation on."

Pre-Sentence Report, pp. 7-8 (boldface type deleted). The Probation Officer concluded, and the

Government agrees, that the statements were sufficient to require the application of the enhancement.

Under U.S.S.G. § 3C1.1, a defendant is enhanced two levels if he has "(A) . . . willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense." Application note 2 instructs that, in applying this provision with respect to alleged false statements by the defendant, "the [court] should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." U.S.S.G. § 3C1.1, n.2. On the other hand, if a defendant commits perjury or suborns or attempts to suborn perjury, the enhancement applies "if such perjury pertains to conduct that forms the basis of the offense of conviction." *Id.* at n.4(b).

The Supreme Court has explained that a defendant testifying under oath commits perjury if he "gives false testimony concerning a material matter with the willful intent to provide false testimony." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). "[I]f a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition . . . set out." *Id.* at 95; *see also United States v. Johnson*, 352 F.3d 146, 148 (5th Cir. 2003) (stating that the court must "identify false testimony concerning a material matter" and "indicate the witness testified with willful intent to provide false testimony."). However, "[u]pon a proper determination that

9

the [defendant] has committed perjury at trial, an enhancement of sentence is required by the Sentencing Guidelines." *Dunnigan,* 507 U.S. at 96. That is, if Defendant gave "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory," he must be enhanced two levels. *Id.* at 94.

In this case, some of the statements identified by the Probation Officer might be subject to interpretation and, thus, not sufficiently "willful" to meet the standard. Additionally, Gilmore's first statement, that the money he received went to help others, could actually be true, and, yet, the jury still could have convicted him. However, Gilmore denies that he solicited money from Hakim in the March 27, 2008 meeting when the recording proves otherwise. Similarly, with regard to the sixth statement, Gilmore's testimony that he only told Hakim he would pay between $5,000 to $10,000 for the lot in the Sherrouse Plantation Subdivision "just so we could move the, the conversation on" is inconsistent with the recorded conversation. At least with regard to these two statements, the Court finds that Gilmore perjured himself, and, thus, the enhancement must apply.

Gilmore's Objection #2 was DENIED.

C.   **Objection #3**

Gilmore argued that the Court should grant his Objections #1 and #2. If so, Gilmore objected that the Pre-Sentence Report should be revised to reflect a base offense level of 20 and a criminal history category of I, which would result in a suggested Guidelines range of imprisonment of 33-41 months. The suggested fine range would also be revised to $7,500-$75,000.

Given the Court's Ruling on Gilmore's Objection #1 and Objection #2, Gilmore's

10

Objection #3 was GRANTED IN PART and DENIED IN PART. His overall offense level was reduced by 10 to a total offense level of 22. With a criminal history category of I, Gilmore faced a Guideline range of imprisonment of 41-51 months. The suggested fine range was revised to $7,500-$75,000.

### D. Additional Objection Raised in Chambers

Finally, during an in-Chambers conference, counsel for Gilmore raised one additional late objection to the Pre-Sentence Report. Counsel argued that Gilmore should not be enhanced four levels for his position as an "elected" official under U.S.S.G. 2C1.1(b)(3) because his base offense level of 14 already took into account his status as a "public" official.

The Government responded that the additional enhancement applied because of Gilmore's status as an elected official, rather than an appointed public official, and, thus, there was no double counting.

As noted, pursuant to U.S.S.G. § 2C1.1(a)(1), Gilmore's base offense level was set at 14 because he was a public official. The Pre-Sentence Report also enhanced Gilmore 4 more levels under § 2C1.1(b)(3) because he was an elected public official. Gilmore contends that this four-level enhancement constitutes impermissible double counting. However, the Guidelines do not contain a general prohibition against double counting. *See United States v. Calbat*, 266 F.3d 358, 364 (5th Cir. 2001) (citation omitted). "Rather, double-counting is prohibited only if it is specifically forbidden by the particular guideline at issue." *Id.* (citation omitted). In this case, the Guidelines specifically contemplate that a public official will have a lower offense level from an *elected* public official. As the commentary notes, a public official is construed broadly to cover persons who are not even employees of a local or state government. U.S.S.G. § 2C1.1 cmt.

n. 1 (definition of "Public official"). However, the broad definition of public official "does not 'fully account[ ]' for the harm that is inflicted when the trust that the official betrays was conferred on him in an election. Being a bribe-taking 'elected public official' is different from being a run-of-the-mill, bribe-taking, non-elected 'public official.'" *United States v. White*, 663 F.3d 1207, 1217 (11th Cir. 2011). Accordingly, Gilmore's additional objection to the Pre-Sentence Report was DENIED.

## II. MOTION FOR DOWNWARD DEPARTURE

Gilmore also filed a Motion for Downward Departure [Doc. No. 166]. In that motion, he argued that the Court should either depart downward from the Guidelines range of imprisonment or issue a non-Guidelines sentence based on Gilmore's good deeds and past integrity; the general deterrence that is satisfied by short sentences for white collar offenses; the collateral consequences Gilmore faces, such as the loss of his law license; and the foreclosure of employment opportunities based on the stigma of his conviction.

### A. Considerations Under the Guidelines

Although Gilmore did not identify any section under the Guidelines as a basis for his Motion for Downward Departure, the Court has attempted to consider any possibility. Under U.S.S.G. §5K2.20, a sentence below the applicable Guidelines range may be warranted in an exceptional case if the defendant's criminal conduct constituted aberrant behavior. "Aberrant behavior" is defined as a single criminal occurrence or single criminal transaction that was committed without significant planning, was of limited duration, and represents a marked deviation by the defendant from an otherwise law-abiding life. *Id.* In determining whether to depart on the basis of aberrant behavior, the Court may consider the defendant's mental and

emotional conditions; employment record; record of prior good works; motivation for committing the offense; and efforts to mitigate the effects of the offense. *Id.*

The Court found that the nature of the offense does not involve a single criminal occurrence or transaction, but rather a series of ongoing conduct. Thus, while the Court did not discount the good works of Gilmore as a lawyer, city councilman, and community volunteer or his reputation in the community, the Court could not say that a downward departure for aberrant behavior was warranted under the Guidelines.

Additionally, under U.S.S.G. §§ 5H1.6 and 5H1.11, neither a defendant's family ties and responsibilities nor his prior good works are "ordinarily relevant" to a determination of the appropriate sentence. Again, the Court did not discount Gilmore's active role as a father and husband and as a community member, but found no basis under the Guidelines for a downward departure.

Thus, to the extent that Gilmore moved for a downward departure under considerations authorized by the Guidelines, Gilmore's motion was DENIED.

### B. Considerations Under 18 U.S.C. § 3553(a)

Finally, prior to imposing sentence, the Court considered whether the recommended Guideline range of imprisonment reasonably addressed Gilmore's criminal conduct and adequately reflected (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to (A) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) afford adequate deterrence to criminal conduct; (C) protect the public from further crimes of the defendant; and (D) provide the defendant with needed educational or vocational

training, medical care, or other correctional treatment in the most effective manner; (3) pertinent sentencing commission policy statements; (4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (5) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

The United States Sentencing Commission has increased the range of imprisonment for Gilmore's offenses of conviction based on valid policy considerations. While the amendments to the Guidelines have resulted in a greater range of imprisonment, the Court did not find that Guideline range to be unreasonable. The Court did not discount the fact that Gilmore has led an otherwise law-abiding life, but his lack of criminal history was taken into account in the Guidelines calculation. Additionally, the Court acknowledged that Gilmore has done good works in the community, but so have many others who have appeared before this Court, particularly those charged with white-collar crimes. Given the nature of the crime, the Court believed that a sentence within the Guidelines range was appropriate. Therefore, Gilmore's Motion for Downward Departure under the § 3553(a) factors was DENIED.

**MONROE, LOUISIANA,** this ____18____ day of April, 2012.

_____
ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE